3:18gp35 (SRU)

OFFICE OF THE CLERK
SUPERIOR COURT & G.A.O.

DOCKET NO.: DBD CV17-6022075-S    2018 NOV 26   PM 3: 26  SUPERIOR COURT

OFFICE OF CHIEF DISCIPLINARY COUNSEL    JUDICIAL DISTRICT

JUDICIAL DISTRICT
OF DANBURY
STATE OF CONNECTICUT

V.                                       OF DANBURY

JOSEPHINE SMALLS MILLER                  NOVEMBER 26, 2018

## MEMORANDUM OF DECISION

### I

### PROCEDURAL HISTORY

In this action, the Office of the Chief Disciplinary Counsel (petitioner) has filed an amended four count presentment against attorney Josephine Smalls Miller (respondent) alleging misconduct (#108).  Count one alleges violations of the Rules of Professional Conduct 1.15 (a) (5) (safekeeping property), 1.15 (c)[1] (safekeeping property) and 8.1 (2) (bar admission and disciplinary matters).  Count two alleges violations of rules 1.3 (diligence), 3.2 (expediting litigation), and 8.4 (4) (misconduct). Count three alleges violations of rules 1.4 (a) (1) (2) (3) (4) (5) and 1.4 (b) (communications).  Count four alleges that with respect to General Statutes § 51-88 and Practice Book § 2-44A, the respondent violated rule 5.5 when she engaged in the unauthorized practice of law by providing legal advice and drafting legal documents for a client relative to an Appellate Court matter while under an order of suspension by that court.

The respondent filed an answer and raised two "affirmative defenses" (#109) which claim that the recommendations of the petitioner and the decisions of the Statewide Grievance Committee (SGC) were based on racially discriminatory and retaliatory reasons, both in violation of the respondent's constitutional rights.

---

[1] In paragraph 7 (b) of its complaint, the petitioner refers to a violation of "Rule 1.15c" although there is no such section in the Rules of Professional Conduct.  However, during the presentment hearing and in its post-trial brief the reference was made to rule 1.15 (c) which is substantively the section that was referred to and addressed by the parties.  As such, it is clear the reference in the complaint is a scrivener's error and will be treated as such by the court.

11/26/18 - JDNO sent re: notice of memo of decision (tc)

131.05
11-26-18

The court held a hearing on the matter on June 25, 26 and 27, 2018, at which time the parties were heard and provided testimony and evidence. The parties stipulated to all of the petitioner's exhibits as being full exhibits. Following the hearing, the parties submitted post-trial briefs the last of which was filed on August 27, 2018. On July 30, 2018, subsequent to the completion of the hearing, the respondent filed a "motion to conform pleadings to the proofs" (#123) which was in reality, by virtue of its text, a request to amend her affirmative defenses. The court has read the pleading liberally pursuant to Practice Book § 1-8. Given that the petitioner filed no objection to it, the court considers the amendment to have become effective pursuant to Practice Book § 10-60 (a) (3).

## II

## STATEMENT OF LAW

The court has jurisdiction to hear such matters based on its inherent authority to discipline counsel, as well as pursuant to the provisions of Practice Book § 2-45. "It is fundamental that [t]he Superior Court possesses inherent authority to regulate attorney conduct and to discipline the members of the bar." (Internal quotation marks omitted.) *O'Brien* v. *Superior Court*, 105 Conn. App. 774, 783, 939 A.2d 1223, cert. denied, 287 Conn. 901, 947 A.2d 342 (2008). As to the standard of proof "in a matter involving attorney discipline, no sanction may be imposed unless a violation of the Rules of Professional Conduct has been established by clear and convincing evidence," *State* v. *Perez*, 276 Conn. 285, 307, 885 A.2d 178 (2005).

There are statutory provisions and rules of practice applicable to reviewing claims of attorney misconduct. General Statutes § 51-80 provides in relevant part: "The Superior Court may admit and cause to be sworn as attorneys such persons as are qualified therefor, in accordance with the rules established by the judges of the Superior Court. . . ." General Statutes

§ 51-84 (a) provides in relevant part: "Attorneys admitted by the Superior Court . . . shall be subject to the rules and orders of the courts before which they act." Practice Book § 2-47 (a) provides in relevant part: "Presentment of attorneys for misconduct . . . shall be made by written complaint of the statewide disciplinary counsel."

Attorney "[d]isciplinary proceedings are for the purpose of preserving the courts from the official ministration of persons unfit to practice in them." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Rozbicki*, 211 Conn. 232, 238, 558 A.2d 986 (1989), aff'd, 219 Conn. 473, 595 A.2d 819 (1991), cert. denied, 502 U.S. 1094, 112 S. Ct. 1170, 117 L. Ed. 2d 416 (1992); *Ex parte Wall*, 107 U.S. 265, 288, 2 S. Ct. 569, 27 L. Ed. 552 (1883); *Chief Disciplinary Counsel* v. *Rozbicki*, 150 Conn. App. 472, 478, 91 A.3d 932, cert. denied, 314 Conn. 931, 102 A.3d 83 (2014). An attorney "as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privilege may and ought to be declared forfeited." *In re Peck*, 88 Conn. 447, 450, 91 A.2d 274 (1914). Therefore, "[i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Botwick*, 226 Conn. 299, 307, 627 A.2d 901 (1993). An attorney "is an officer of the court . . . . Disciplinary

proceedings not only concern the rights of the lawyer and the client, but also the rights of the public and the rights of the judiciary to ensure that lawyers uphold their unique position as officers . . . of the court. . . .  An attorney must conduct himself or herself in a manner that comports with the proper functioning of the judicial system." (Internal quotation marks omitted.) *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 232, 890 A.2d 509, cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006); Rules of Professional Conduct, preamble.

"[A] hearing such as this is not the trial of a criminal or civil action or suit, but an investigation by the court into the conduct of one of its own officers, and that, therefore, while the complaint should be sufficiently informing to advise the . . . attorney of the charges made against [her], it is not required that it be marked by the same precision of statement, or conformity to the recognized formalities or technicalities of pleadings, as are expected in complaints in civil or criminal actions." (Internal quotation marks omitted.)     *Burton* v. *Mottolese*, 267 Conn. 1, 20-21, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004).

### III

In that the counts against the respondent involve allegations of violations of different sections of the Rules of Professional Conduct, and some have facts separate and apart from other counts, the court will address each count individually and set forth the facts it finds relevant to each specific count.

### A

### *Count One – Grievance Complaint #15-0652*

As to count one, the petitioner alleges violations of rules 1.15 (a) (5) (safekeeping property), 1.15 (c) (safekeeping property) and 8.1 (2) (bar admission and disciplinary matters) of

the Rules of Professional Conduct.  The respondent, juris number 422896, has been an attorney since 1980 and was admitted to practice law in Connecticut on June 14, 2004. [Tr. 2 57:3-12, Miller].[2] She has practiced as a solo practitioner during her career in Connecticut. [Tr. 2 57:22, Miller; Respondent's Ex. K].[3]  During the relevant time of the grievance complaint, she maintained an IOLTA account at Webster Bank. [Tr. 2 58:3, Miller]. She did not maintain a separate business account. [Tr. 2 58:7, Miller]. She did maintain a personal checking account. [Tr. 2 58:8-10, Miller].

During her time as an attorney in Connecticut and while attending her church of choice, the respondent met and became friends with a woman by the name of Sharon Israel I Am, whom she described as her "church sister." [Tr. 2 58:14-25, Miller]. They remained friends until approximately 2006 or 2007, when Ms. I Am moved out of state. In May, 2013, after having little or no contact between them in the intervening years, the respondent was contacted by Ms. I Am. [Tr. 2 59:7-10, Miller]. Pleased to have heard from her friend, the respondent agreed that the two should meet and they did so. During this meeting at the respondent's office, Ms. I Am told the respondent that she had come into a large sum of money and wanted some advice on how best to handle it. [Tr. 2 59:14-19, Miller]. The respondent gave her advice in this respect and Ms. I Am offered her $5,000 for the consultation which the respondent at first declined, but later accepted at Ms. I Am's insistence. [Tr. 2 60:7-17, Miller].

After the passage of a couple of weeks, Ms. I Am again contacted the respondent saying she wanted to renew their friendship and asked that they meet at a local hotel, which they did.

<hr>

[2] "Tr. 1" refers to the June 25, 2018 morning transcript; "Miller" refers to the witness.
"Tr. 2" refers to the June 25, 2018 afternoon transcript.
"Tr. 3" refers to the June 26, 2018 transcript.
"Tr. 4" refers to the June 27, 2018 transcript.

[3] Conflicting with her testimony, her resume states she was admitted in Connecticut in 2002.

This was followed by several social visits. At a visit on or about May 27, 2013, Ms. I Am told the respondent that she wanted to "bless" her by giving her a gift of $200,000 and gave her a check dated May 27, 2013 payable to her in that amount. [Tr. 2 62:10-23, Miller; Petitioner's Ex. 5]. Ms. I Am placed no conditions or restrictions on the respondent's usage of the gift. [Tr. 2 63:13-15, Miller]. Although the funds were not related to any specific professional work done by the respondent for Ms. I Am, the respondent wrote her own name onto the check and deposited the funds into her IOLTA account on May 28, 2013. [Tr. 2 65:12-18, Miller; Petitioner's Ex. 5]. The respondent indicated her reason for placing the funds into the IOLTA account was that Ms. I Am was an "odd person." In doing so, the respondent co-mingled the gift funds with $14,587.59 of her clients' funds held in the IOLTA account.

Having received this unsolicited gift, the respondent decided to use ten percent (10%) of the funds to make a donation to her church, Community Temple. She testified "that any money that comes into my hands, I, as a matter of religious belief, pay a tithe on it." [Tr. 2 67:3-7, Miller]. On June 7, 2013, the respondent wrote check #1145 from her IOLTA account made payable to Josephine S. Miller in the amount of $10,000. [Tr. 2 66:23-25, Miller; Petitioner's Ex. 5]. The back of the check was endorsed to the order of Community Temple. On July 21, 2013, the respondent wrote a second check from her IOLTA account, #1118, made payable to Josephine S. Miller in the amount of $10,000, which was also endorsed to the order of Community Temple. [Tr. 2 67:16-20, Miller; Petitioner's Ex. 5]. Ms. I Am did not instruct nor require the respondent to make any donation to her church at the time she made the gift to the respondent. [Tr. 2 67:24-68:1, Miller].

In August, 2013, approximately three months after respondent's receipt of the gift, Ms. I Am contacted the respondent. In her conversation with the respondent, Ms. I Am asked her to

quit the practice of law as she felt it was inconsistent with their religious beliefs. When the respondent declined, Ms. I Am requested the return of the $200,000 gift. [Tr. 2 68:9-69:2, Miller]. The respondent explained that she had made the donations to the church but that she would return the remaining $180,000 which she still held. On August 12, 2013, the respondent wrote a third check from her IOLTA account, #1134, made payable to Sharon Israel I Am in the amount of $180,000. [Petitioner's Ex. 5].

Following a complaint, a grievance was initiated against the respondent by the Danbury Judicial District Grievance Panel. Thereafter, the Grievance Panel for the Judicial District of Stamford/Norwalk notified the respondent by letter dated March 22, 2016, that on January 27, 2016, it had determined there was probable cause to believe that she was guilty of misconduct. [Petitioner's Exs. 7, 10]. At the presentment hearing, the respondent acknowledged the finding of probable cause. The letter issued by the panel advised the respondent that she had violated rules 1.15 (a) (4) and (5) of the Rules of Professional Conduct in that the gift funds provided by Ms. I Am were improperly deposited into the respondent's IOLTA account.[4] Id. On March 30, 2016, the petitioner sent a letter to the respondent which requested that she provide eight listed items so that the petitioner could conduct an audit of the IOLTA account. [Petitioner's Ex. 6]. The requested information, pursuant to rule 8.1 of the Rules of Professional Conduct, was to be provided within fourteen days and noted that "[y]our failure to comply with this demand will be considered professional misconduct and expose you to further disciplinary action." [Id].

On June 9, 2016, a reviewing committee of the Statewide Grievance Committee (SGC) conducted a hearing on complaint #15-0652 and issued a decision on November 18, 2016, finding clear and convincing evidence that the respondent knowingly failed to respond to the

___
[4] The presentment to this court did not encompass rule 1.15 (a) (4) and therefore the court need not address it.

lawful demand for information from the disciplinary authority, noting that as of the date of that hearing, no documents had been submitted by the respondent. [Petitioner's Ex. 13].

At the presentment hearing before this court, the respondent submitted Respondent's Exhibit O, which included an e-mail dated June 22, 2016 from the petitioner acknowledging receipt of some of the documents originally requested on March 30, 2016. It also again asked for the IOLTA statements from the bank supporting the documents the respondent had belatedly forwarded. In her testimony, the respondent admitted that she did not timely or fully comply with the initial request. [Tr. 4 53:14-24, Miller]. She acknowledged that her reply was delivered not only eighty-four (84) days after the original request, but also after the reviewing committee had completed its hearing. [Tr. 4 53:4-10, Miller].

As to rule 1.15 (a) (5) of the Rules of Professional Conduct, the rule reads in relevant part: "An IOLTA account shall include only client or third person funds, . . ." Third person funds held by an attorney may only be placed in an IOLTA account in connection with the representation of a client.[5] The court finds by clear and convincing evidence that the respondent has violated rule 1.15 (a) (5). The $200,000 given to the respondent by Ms. I Am was an unconditional gift that was accepted by the respondent and became her personal property. She deposited those funds into her IOLTA account and exercised possession and control over them, evidenced by her issuing two separate $10,000 checks out of the account as donations to her church on June 7, 2013 and July 21, 2013. [Petitioner's Ex. 5]. The respondent characterized the transaction as an honest one that had no nefarious motive. In fact, the court finds that the respondent had no intent through this deposit to deceive anyone or deprive anyone of funds that otherwise rightfully belonged to them. However, the fact that the respondent returned the balance of the funds to

[5] Rule 1.15 (b) provides in relevant part: "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property."

the donor some several months later does not excuse her violation. At the time of the deposit, the funds did not belong to a client of the respondent and had no connection to the representation of a client. Rules of Professional Conduct 1.15 (b).

As to rule 1.15 (c), it provides: "A lawyer may deposit the lawyer's own funds in a client trust account for the sole purposes of paying bank service charges on that account or obtaining a waiver of fees and service charges on the account, but only in an amount necessary for those purposes." Given the facts found by the court as recited above, there is clear and convincing evidence the respondent has violated rule 1.15 (c) of the Rules of Professional Conduct. There was no evidence that the funds deposited were to pay bank service charges. Further, the amount deposited could not reasonably be thought to be for the purpose of covering such charges as they were tremendously in excess of any amount necessary to do so.

As to rule 8.1 (2), it provides in relevant part that a lawyer in connection with a disciplinary matter shall not "knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority . . . ." The commentary to rule 8.1 provides that "it is a separate professional offense for a lawyer to knowingly make a misrepresentation or omission in connection with a disciplinary investigation of the lawyer's own conduct." From the facts recited above, the court finds by clear and convincing evidence that the respondent has violated rule 8.1 (2) of the Rules of Professional Conduct, in that after being advised of a probable cause finding against her, she failed to timely or completely respond to the disciplinary authority's lawful demand for information.

B

*Count Two - Grievance Complaint #15-0688*

As to count two, the petitioner alleges violations of rules 1.3 (diligence), 3.2 (expediting litigation) and 8.4 (4) (misconduct) of the Rules of Professional Conduct. The basis of the alleged violation stems from the respondent's conduct in several matters that were filed in the Superior Court.  The facts as to each case will be set out separately and then the alleged violations shall be addressed on the basis of the respondent's actions in each case individually as well as collectively.

*Ronald Stone v. Bridgeport Board of Education*

In the matter of *Ronald Stone v. Bridgeport Board of Education*, judicial district of Fairfield, Docket No. FBT-CV13-6032345-S, the respondent represented the plaintiff in a complaint alleging "adverse employment action because of the plaintiff's race and in retaliation for his having raised a complaint of discrimination." [Petitioner's Ex. 4]. On September 3, 2014, the court, *Bellis, J.*, dismissed the action based on the respondent's failure to appear at a status conference scheduled for that date. The dismissal was ordered after the respondent repeatedly failed to appear for status conferences, file pleadings, and respond to discovery. [Petitioner's Ex. 4, order dated February 26, 2015].

The respondent's repeated violations are outlined in the Bridgeport Board of Education's July 7, 2014 motion for nonsuit, sanctions and judgment of dismissal. [Petitioner's Ex. 4]. On January 7, 2014, the court had ordered that the parties appear for a status conference on January 23, 2014. Defendant's counsel appeared but the respondent failed to attend. On February 21, 2014, the court again ordered the parties to attend a status conference, this time on March 13, 2014. On the day of the scheduled status conference, the respondent filed a caseflow request indicating she had a conflicting status conference involving a family case in the Superior Court at Hartford. [Petitioner's

10

Ex. 4, Caseflow Request]. No action was taken on the request, thereby leaving the respondent compelled to appear in Bridgeport for the status conference but she did not do so.

On March 19, 2014, the defendant filed a second amended motion for modification of scheduling order and sanctions, because of the plaintiff's failure to appear for his deposition, despite numerous notices, and to attend court ordered status conferences. [Petitioner's Ex. 4.] On March 28, 2014, the court yet again ordered the parties to appear for a status conference on April 10, 2014, and indicated the defendant's motion would be heard on that date. Defendant's counsel appeared, but again the respondent did not appear. [Id.] Following her receipt of a call from the clerk's office that morning inquiring as to her whereabouts, the respondent arrived almost two hours late. [Id.] The court then held a hearing on the defendant's motion and made clear to the respondent that if she failed again to appear or meet a deadline the court would dismiss the case. [Petitioner's Ex. 4, Transcript dated April 10, 2014 22:18-26.]

On June 15, 2014, the respondent sent opposing counsel an email indicating her availability for the deposition of the plaintiff on July 2, 2014. Based on that request, the defendant's counsel issued a deposition notice to the respondent confirming the scheduling of the deposition. [Petitioner's Ex. 4, exhibits E and F to motion dated July 7, 2014]. This notice was followed up on July 1, 2014, by an email to the respondent asking her to confirm the Stone deposition for the following day at 10:00 a.m. The respondent replied at 2:00 p.m. on July 1, 2014, that "we will need to reschedule as I became pre-occupied with a trial and did not have tomorrow down. Can we do this next week perhaps July 11 I think I'm free. But will need to check with Mr. Stone." [Petitioner's Ex. 4, exhibit G to the motion dated July 7, 2014]. At the presentment hearing, the respondent testified that she believed she failed to insert the July 2, 2014 deposition date into her electronic calendar. [Tr. 2 81:22-27, Miller].

On June 6, 2014, the defendant filed an answer, special defenses and counterclaim. [Petitioner's Ex. 4]. Respondent failed to file an answer to the counterclaim and the defendant thereafter filed a motion for default for failure to plead. [Petitioner's Ex. 4, motion dated June 11, 2014]. On July 7, 2014, the defendant filed a motion for nonsuit, sanctions and judgment of dismissal which was set down for a hearing for September 3, 2014. On that date, the court, *Bellis, J.*, dismissed the action based on the respondent's repeated failures to appear in court. The respondent testified at the presentment hearing that she "had not noted the date of September 3rd as the date for the status conference." [Tr. 2 84:1-2, Miller].

Following the dismissal of the case, the respondent filed a motion to open judgment of dismissal on November 28, 2014. [Petitioner's Ex. 4, motion]. The court scheduled a hearing on the motion for January 7, 2015. On December 31, 2014, the respondent filed a motion for continuance of the hearing which was granted by the court and the hearing was rescheduled to January 29, 2015. [Petitioner's Ex. 4, motion and order]. On January 28, 2015, the day before the hearing, the respondent filed a caseflow request indicating that she had a deposition to attend on January 29, 2015, which had to be completed by January 31, 2015. [Petitioner's Ex. 4, caseflow request]. That request was denied by the court that same day. [Petitioner's Ex. 4, order]. The court had previously advised the respondent not to use a caseflow request to ask for a continuance as such a request needed to be made by proper motion.[6] Nevertheless, the respondent persisted in utilizing a caseflow request to seek continuances. At the hearing on the motion to open, the court set out on the record the respondent's history of non-appearance in the case. The respondent did not appear at the hearing and

---

[6] The respondent had done the same thing in the matter of *Josephine Miller v. Bridgeport Board of Education*, judicial district of Fairfield, Docket No. FBT-CV-10-6011406-S, in which she had sued to collect attorney's fees for representation of an employee of the defendant. The court had admonished her not to use a caseflow request form in seeking a continuance of the matter, but rather, to file a motion for continuance. On July 10, 2012, Judge Bellis dismissed that case because the respondent failed to appear for trial. The court, in ruling on a motion for reconsideration indicated "the plaintiff improperly filed a caseflow request rather than a proper motion for continuance. The present case was set down for a trial well over 6 months beforehand, a date the plaintiff selected...." [Respondent's Ex. D]. At the presentment hearing, the respondent acknowledged in her testimony that she understood that to mean that she should not file a caseflow request when requesting a continuance. [Tr. 1 92:17-20, Miller].

as a result, was contacted and ordered to appear in court that afternoon, at which time she did appear. [Petitioner's Ex. 4, Transcript dated January 29, 2015].

On February 26, 2015, the court entered an order indicating that the Respondent did not provide a good and compelling reason to open the judgment. The court held "given the pattern in this case the plaintiff's counsel filing caseflow requests rather than proper continuance requests, appearing hours late for scheduled events, and importantly, by repeatedly failing to appear for scheduled events, along with the [inexcusable] neglect of counsel leading to the dismissal of the case, the court cannot in good conscience find reasonable cause. As such the motion to open is denied." [Petitioner's Ex. 4, order]. When questioned at the presentment hearing as to the reasons why she did not appear at the various scheduled events, the respondent repeatedly replied with words to the effect of "I don't know at this time." [Tr. 2 73:14, 74:7, 74:10, 75:5, 75:8, 76:20, Miller].

The dismissal of the case was not appealed.

### *Gabor Meszaros* v. *Leonard Banks*

In the matter of *Gabor Meszaros* v. *Leonard Banks*, judicial district of Fairfield, Docket No. FBT-CV-12-6027816-S, a Bridgeport police officer brought a claim against the defendant for injuries suffered in a motor vehicle accident. [Petitioner's Ex. 3, docket sheet]. The respondent filed a counterclaim on behalf of the defendant alleging that the plaintiff was responsible for the defendant's personal injuries. [Tr. 3 35:9-15, Miller]. The case was scheduled to begin jury selection on September 9, 2014. [Tr. 3 36:20-24, Miller]. On September 8, 2014, the plaintiff's attorney filed a motion for continuance for the reason that he had a funeral to attend. The motion was granted that same date. In addition, the respondent had a pre-trial conference in Waterbury scheduled for September 11, 2014. As a result, the parties agreed that jury selection would begin at noon on September 11, 2014. [Tr. 3 37:22-24, Miller]. That morning, the respondent attended the pre-trial conference at the Waterbury Superior Court. [Tr. 3 38:3-9, Miller]. She remained there until approximately 11:00 a.m., but then drove to Danbury, claiming she was not feeling well. [Tr. 3

38:23-27, Miller]. Upon returning to her office in Danbury, the Respondent filed a caseflow request with the court stating: "Counsel for defendant Leonard Banks required to seek medical treatment from primary care physician. Continuance is sought until after medical appointment on September 11, 2014." [Petitioner's Ex. 3; caseflow request dated September 11, 2014; Tr. 3 39:13-16, Miller]. Upon failing to appear for the commencement of jury selection, the court (*Bellis, J.*), entered an order dismissing the counterclaim. [Petitioner's Ex. 3, Obj. to Motion to Open, exhibit E]. Despite her claim of illness, the respondent filed various pleadings in *different* cases that same day, including a caseflow request, certificate of closed pleadings, and an objection to a motion for summary judgment. [Petitioner's Ex. 3, Obj. to motion to open, exhibit H].

On January 8, 2015, 119 days after the entry of the dismissal, the respondent filed a motion to open judgment of dismissal. [Petitioner's Ex. 3]. A hearing on the motion was scheduled for February 25, 2015. The respondent failed to appear to pursue her motion. As a result, the court entered the following order:

> Counsel for the counterclaim plaintiff (Attorney Miller) failed to appear for the hearing on her motion to open dismissal, despite the fact that written notice was sent by the court. Counsel for the counterclaim defendant (Attorney Edwards) appeared on time, and the court instructed Attorney Edwards to call Attorney Miller. Attorney Edwards represented, on the record, that pursuant to the court's instructions, she did call Attorney Miller, who told her that she thought the hearing was next week, and that furthermore, her pipes had burst. No continuance request was filed by Attorney Miller, nor did Attorney Miller contact the court until after she was called by Attorney Edwards. The court finds that Attorney Miller, who repeatedly fails to appear for scheduled court events, waived her right to argument on the motion to open, and the court, having reviewed all the filings, denies the motion to open on the papers.... There is simply no good cause to grant Attorney Miller's motion.... For these reasons, the motion to open is denied. Due to Attorney Miller's consistent failure to appear in court on her various cases, as well as her continued insistence on filing last-minute "caseflow requests" rather than proper motions for continuance, the court will not entertain a motion to reconsider or reargue this motion.

[Petitioner's Ex. 3, order February 25, 2018]. The respondent testified that she had believed that the hearing was scheduled for the following week. No appeal was taken from the court's order dismissing the case.

14

At the presentment hearing, the respondent testified as to the circumstances of her illness and her condition that prevented her from appearing at the September 11, 2014 commencement of jury selection in the *Meszaros* v. *Banks* matter and the subsequent February 25, 2015 hearing on the motion to open judgment.   Specifically, she recounted that her condition was such that she required bed rest.  However, under questioning by the Hon. Vanessa L. Bryant in the federal court matter of *Smith* v. *Department of Correction, et al*, Docket No. 13-CV-8L8 (VLB) (D. Conn.), the respondent conceded that she was not diagnosed with any medical condition until September 15, 2014, and that she had not been prescribed bed rest by any physician.  [Petitioner's Ex. 3, objection to motion to open].  In that same case, the respondent had filed an affidavit dated November 5, 2014, that addressed her health.  Paragraph 14 of the affidavit reads as follows:  "As a consequence of this health issue, many work matters have been delayed.  My 17 day trip outside of the country on an evangelistic and preaching mission (July 31 through August 17) also meant that many matters accumulated during my absence that required work upon my return.  When added to new matters that accumulated while I was on medical rest the work has not yet been caught up."  [Respondent's Ex. M].

As to rule 1.3 of the Rules of Professional Conduct, it provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." The commentary to this rule provides that "[a] lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. . . . A lawyer's workload must be controlled so that each matter can be handled competently."

Her multiple failures to appear for scheduled court matters in both the *Stone* and *Meszaros* matters reveal a pattern of both negligence and intentional avoidance of such matters, often to the detriment of her clients. In *Stone*, status conferences had to be rescheduled numerous times. The defendant was prevented from taking the deposition of the plaintiff because the respondent canceled scheduled dates on very short notice causing inconvenience to opposing counsel and parties. In

*Meszaros*, the respondent waited until literally the next to last day before filing the motion to open dismissal. Even accounting for the respondent's credible testimony that the delay was partly due to the respondent seeking to obtain other counsel for her client, the court can make a reasonable inference from the facts above that the respondent's workload, regardless of its size, exceeded her capacity to timely attend court appearances. This led to multiple dismissals of her clients' cases. The commentary to rule 1.3 states that "[a] client's interest often can be adversely affected by the passage of time or the change of conditions; in extreme instances, . . . the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness." Needless to say, it also undermines the public's respect for the judicial system. The court finds from the facts above that there is clear and convincing evidence that the respondent has committed a violation of rule 1.3 of the Rules of Professional Conduct.

As to rule 3.2, relative to expediting litigation, it states that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." The commentary to that rule provides that "[d]ilatory practices bring the administration of justice into disrepute. . . . It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay." The facts set forth above relative to the allegations of count two are replete with evidence of the respondent's repeated failure to attend scheduled court conferences, hearings, depositions, etc., that caused undue delay in the progress of multiple cases. The court finds from the facts above that the respondent not only delayed and frustrated the attempts of the court and opposing parties to obtain a timely resolution of the matters pending before the court, but also failed to make reasonable efforts to expedite litigation consistent with the interests of her own clients. Accordingly, there is clear and convincing evidence that the respondent committed a violation of rule 3.2 of the Rules of Professional Conduct.

Rule 8.4 of the Rules of Professional Conduct provides in part that "[i]t is professional misconduct for a lawyer to," among other things, "[e]ngage in conduct that is prejudicial to the administration of justice." Rules of Professional Conduct 8.4 (4). "It is well established that members of the bar [must] conduct themselves in a manner compatible with the role of courts in the administration of justice." (Internal quotation marks omitted.) *Notopoulos* v. *Statewide Grievance Committee*, supra, 277 Conn. 235. The respondent's lack of diligence, which as noted above was in some cases either negligent or an intentional avoidance of her various obligations, led to the dismissal of her clients' matters. This conduct was certainly prejudicial to the administration of justice in that it not only impeded the ability of the court and opposing counsel to timely dispose of pending matters, it specifically resulted in the dismissal of her own clients' matters without a hearing on the merits. This is particularly noteworthy with respect to this rule as the respondent was specifically forewarned by the court that continued failure to appear in court as scheduled or to meet a court deadline would result in dismissal of her client's case. [Petitioner's Ex. 4, transcript]. The court finds from the facts above that there is clear and convincing evidence that the respondent has committed a violation of rule 8.4 (4) of the Rules of Professional Conduct.

C

*Count Three – Grievance Complaint #17-0405*

As to count three, the petitioner has alleged that the respondent violated rules 1.4 (a) (1), (2), (3), (4) and (5) as well as 1.4 (b) of the Rules of Professional Conduct, all of which relate to communications with one's client. Upon completion of the presentation of the petitioner's evidence, the respondent moved the court to dismiss count three on the basis that the petitioner had failed to put forth any evidence to establish a violation of those rules.[7] Though not

---

[7] Though not cited by the respondent, the court took the position that her motion was based upon the standard set forth in Practice Book § 15-8 for regular civil court cases that allows a party to seek a dismissal of a case where a plaintiff has failed to make out a prima facie case upon the conclusion of its evidence and has rested.

specifically addressing that standard, the petitioner conceded that it had not set forth sufficient evidence to prove by clear and convincing evidence that the respondent had violated rules 1.4 (a) (1), (2), (3) and (4).  It did however claim that there was sufficient evidence to proceed as to rules 1.4 (a) (5) and 1.4 (b).  The court, having reserved decision on the respondent's motion, hereby grants the motion as to 1.4 (a) (1), (2), (3) and (4) and denies it as to 1.4 (a) (5) and 1.4 (b).

Rule 1.4 (a) (5), states that "[a] lawyer shall: . . . (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law." Rule 1.4 (b) provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The respondent has admitted in her pleadings that the Danbury Judicial Grievance Panel made a finding of probable cause against her relative to a complaint brought against her by Jasmine Williams and that any action for an order of presentment was to be consolidated with the other pending matters that are the subject of this action.

The court finds the following facts as to this count.  On December 9, 2014, the Appellate Court in *Marjorie Coble* v. *Bridgeport Board of Education, Rebecca Willis* v. *Community Health Services, Inc., et al., Margaret Jordan Addo* v. *Winston Rattray* and *Andrew Cimmino* v. *Maria Marcoccia, et al* entered an order that read as follows:

> "After reviewing Attorney Josephine Smalls Miller's conduct in *Marjorie Coble* v. *Bridgeport Board of Education*, AC 36677, *Rebecca Willis* v. *Community Health Services Inc. Et Al.*, AC 36955, *Andrew Cimmino* v. *Maria Marcoccia Et Al.*, AC 35944 and *Margaret Jordan Addo* v. *Winston Rattray*, AC 36837, the Appellate Court has determined that Attorney Josephine Smalls Miller has exhibited a persistent pattern of irresponsibility in handling her professional obligations before this court. Attorney Smalls Miller's conduct has included the filing of frivolous appeals and the failure to file, or to file in timely and

appropriate fashion, all documents and materials necessary for the perfection and prosecution of appeals before this court.

Attorney Josephine Smalls Miller's conduct before this court has threatened the vital interests of her own clients while consuming an inordinate amount of this court's time and her opponents' resources. Attorney Josephine Smalls Miller has neither accepted personal responsibility for the aforesaid conduct nor offered this court any assurance that such conduct will not be repeated, based upon either her commitment to improving her knowledge of appellate practice and procedure or her institution of changes in her law practice to monitor her cases more effectively and ensure timely compliance with our rules of procedure.

IT IS HEREBY ORDERED THAT:

1. Attorney Josephine Smalls Miller is suspended from practice before this court in all cases, except for the case of *Margaret Jordan Addo* v. *Winston Rattray*, AC 36837, effective immediately for a period of six months from issuance of notice of this order until June 9, 2015.

2. After June 9, 2015, Attorney Josephine Smalls Miller may not represent any client before this court until she files a motion for reinstatement and that motion has been granted. The motion for reinstatement shall not be filed until after June 9, 2015. Any motion for reinstatement shall include a personal affidavit in which Attorney Josephine Smalls Miller: A) Commits herself to discharging her professional responsibilities before this court in a timely and professional manner; B) Provides documentary proof of successful completion of a seminar on legal ethics and a seminar on Connecticut appellate procedure; C) Documents any other efforts since the date of this order to improve her knowledge of appellate practice and procedure; and D) Offers this court detailed, persuasive assurances that she has implemented changes in her law practice designed to ensure full compliance with the rules of appellate procedure including a written plan indicating what procedures she has implemented in her office to ensure her compliance with the appellate rules and procedures and to protect her clients' interests.

3. After June 9, 2015, upon the filing and granting of a motion for reinstatement, Attorney Josephine Smalls Miller may resume the practice of law before the Appellate Court if she is otherwise qualified to practice law in the courts of this state.

4. The Appellate Court Clerk's Office is directed not to accept for filing and to return any documents filed in violation of this order.

5. If Attorney Josephine Smalls Miller violates the provisions of this order she is subject to further sanctions.

It is further ordered that these matters are referred to the Chief Disciplinary Counsel for review and further action as it is deemed appropriate."

[Petitioner's Ex. 1; Respondent's Ex. A].

19

Respondent filed a writ of error to the Connecticut Supreme Court to challenge the order. The writ was dismissed on April 5, 2016. [Tr. 3 58:5-8, Miller].

In October, 2016, the respondent met with Jasmine Williams (Williams). [Tr. 3 44:26-27, Miller]. In a child protection action in the Superior Court, Williams' parental rights to her two minor children had been terminated. Seeking review of the judgment, she retained attorney James Hardy (Hardy) to file an appeal on her behalf. Hardy attempted to file the appeal but failed to make payment of the necessary filing fee. As a result, that appeal was dismissed by the Appellate Court. Thereafter, Hardy filed a second appeal seeking the same review. The Office of the Attorney General filed an appearance on behalf of the state of Connecticut and moved to have that appeal dismissed also. [Tr. 3 45:12-25, Miller]. At that point in time, Hardy referred Williams to the respondent. He credibly testified as to his reason for doing so; "I had explained to Ms. Williams that although I have handled some appellate matters previously in the past, it--it doesn't make up a majority of my practice, and I had indicated to her that I thought because of Attorney Miller's supreme knowledge with respect to appellate matters and her expertise and skill set, that she would be better suited at the very least to assist us in filing the appeal." [Tr. 2 6:21-27, Hardy]. He also told Williams that the respondent's involvement would not include going to court but would be primarily behind the scenes by assisting with the preparation and drafting of documents. In meeting with Williams, the respondent understood the purpose for which Williams had come to see her. "Well, I knew from Attorney Hardy that he wanted me to take whatever steps were necessary to try to resurrect this appeal that Ms.-you know, had been rejected and that he had to refile." [Tr. 3 46:9-12, Miller]. Respondent presented Williams with a retainer agreement which was signed on October 1, 2016. [Tr. 3 47:2-4, Miller; Petitioner's Ex. 9]. That agreement provided in relevant part: "Jasmine Williams . . . retains Attorney Miller to

represent her with respect to the following: A juvenile court termination of parental rights appeal. This agreement contemplates that Attorney Miller will provide legal services at the appellate court level, specifically reviewing of the relevant trial transcripts, documents, and orders, and drafting of the appellate brief. Attorney James Hardy will be responsible for oral argument of the case." [Petitioner's Ex. 9]. Further, in her answer to the grievance complaint that led to the current presentment, the respondent acknowledged that "[Williams] signed a retainer agreement at that time and paid an initial amount of $2,000 toward an estimated cost of $10,000 to fully prosecute the appeal." [Petitioner's Ex. 8].

Even prior to the execution of the agreement, by August or September of 2016, the respondent assisted Hardy with the appeal by drafting a pleading entitled appellant's objection to petitioner/appellee's motion to dismiss dated September 22, 2016. [Petitioner's Ex. 12]. Thereafter, pursuant to the retainer agreement, the respondent reviewed the forty-five page Superior Court decision, as well as client notes and documents provided by Hardy. [Tr. 3 50:3-14, Miller]. She continued to assist Hardy and Williams with the appeal by drafting a motion for reconsideration of the Appellate Court's granting of a motion to dismiss and forwarded it to Hardy for him to file in the Appellate Court. She also advised Hardy and Williams that a motion for permission to file a late appeal should be pursued. Based on that advice, she drafted the motion dated December 6, 2016 and again forwarded it to Hardy for filing under his letterhead. [Tr. 3 51:21-27, Miller; Petitioner's Ex. 12]. Following a ruling from the Appellate Court denying the motion for permission to do the late filing, the respondent met with Williams to consider other legal options. [Tr. 3 53:15-25, Miller; Petitioner's Ex. 9; Respondent's Ex. U].

At the time of the execution of the retainer letter with Williams, the respondent knew she had been suspended by the Appellate Court from representing clients in that court.[8] The information as to the limitation on her ability to practice before the Appellate Court was not found within any of the terms of the written retainer agreement. Although the retainer agreement indicated Hardy would be responsible for oral argument, this does not excuse the respondent's failure to completely provide all relevant information to Williams that would enable her to make an informed decision regarding the respondent's representation of her. At the presentment hearing, the respondent credibly testified that she orally advised Williams that there were some restrictions on her ability to represent her before the Appellate Court. However, her oral advisement was completely inconsistent with the express terms of the retainer letter which made no reference whatsoever as to any limitations placed upon her by the Appellate Court. Such conflicting information made it impossible for Williams to make an informed decision regarding the respondent's representation of her. The tangible impact of this was exemplified through the respondent's inability to file an appearance in the Appellate Court on Williams' behalf. Because of this, the respondent did not receive any notices from the Appellate Court relative to the case and had to rely upon Hardy for information as to the status of the case. After traveling out of the country to Africa for several weeks from late December, 2016 to sometime in January, 2017, it was only upon her return that she learned from Hardy that the motion to file a late appeal had been denied. By the time the respondent could consult with Williams, the period to seek any further appeal to the Supreme Court had passed.

Notably, Hardy also testified at the hearing that he and the respondent had been involved in a similar arrangement relative to an appeal to the Appellate Court involving an individual by

[8] In fact, the court later clarified the respondent's status with that court by a second order of February 15, 2018, which specifically stated she could not represent any clients in the court. The respondent had contended that the original December 9, 2014 order only prohibited her from *appearing* before the Appellate Court.

the name of Darric Myers.[9] [Tr. 2 22:21-23:4, 48:10-50:2, 51:5-52:11, Hardy]. In that instance, while the respondent was under suspension by the Appellate Court, it was agreed that Hardy would file the appearance with the court and physically appear while the respondent would do work similar to what was described relative to the Williams matter. This, along with the rest of Hardy's testimony, the court finds credible.

From the facts above, the court finds that there is clear and convincing evidence that the respondent has committed a violation of rules 1.4 (a) (5) and 1.4 (b) of the Rules of Professional Conduct.

## D

### Count Four

As to count four, the petitioner alleges the respondent engaged in the unauthorized practice of law in violation of rule 5.5 of the Rules of Professional Conduct, which states in relevant part: "(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so. The practice of law in this jurisdiction is defined in Practice Book Section 2-44A."[10]

---

[9] The court takes judicial notice of the matter *Jordan Myers* v. *Darric Myers*, judicial district of New Haven, Docket No. FA-15-4066531-S as well as the Appellate Court case, *Jordan M.* v. *Darric M.*, 168 Conn. App. 314, 146 A.3d 1041, cert. denied, 324 Conn. 902, 151 A.3d 1287 (2016).
[10] Connecticut Practice Book § 2-44A provides in relevant part:
(a) General Definition: The practice of law is ministering to the legal needs of another person and applying legal principles and judgment to the circumstances or objectives of that person. This includes but is not limited to:
(1) Holding oneself out in any manner as an attorney, lawyer, counselor, advisor or in any other capacity which directly or indirectly represents that such person is either (a) qualified or capable of performing or (b) is engaged in the business or activity of performing any act constituting the practice of law as herein defined.
(2) Giving advice or counsel to persons concerning or with respect to their legal rights or responsibilities or with regard to any matter involving the application of legal principles to rights, duties, obligations or liabilities.
(3) Drafting any legal document or agreement involving or affecting the legal rights of a person....
(6) Engaging in any other act which may indicate an occurrence of the authorized practice of law in the state of Connecticut as established by case law, statute, ruling or other authority. "Documents" includes, but is not limited to ... pleadings and any of the papers incident to legal actions and special proceedings.

23

The facts relative to count four are the same as those set forth in count three above and clearly support a violation of rule 5.5. The Appellate Court's order of December 9, 2014, as supplemented by its order of February 15, 2018, suspended the respondent from practicing and representing any individuals before the court (with one exception) until she had met the conditions set out for reinstatement.  The respondent has acknowledged that she had not been reinstated by the court at any time prior to the presentment hearing.  She also acknowledged that, while under suspension, she did work for Williams relative to her appeal in the Appellate Court, including, but not limited to, the review of notes and documents, legal research, drafting pleadings, and providing legal advice. Specifically, the retainer letter prepared by the respondent and executed by Williams stated that "[t]his agreement contemplates that attorney Miller will provide legal services at the Appellate Court level." [Petitioner's Ex. 9]. This language was placed in the agreement despite the express order of the Appellate Court which provided that "[a]ttorney Josephine Smalls Miller is suspended from practice before this court in all cases" and further provided that "[a]fter June 9, 2015, attorney Josephine Smalls Miller may not represent any client before this court until she files a motion for reinstatement and that motion has been granted."[11] [Petitioner's Ex. 1].

The court finds that the petitioner has established by clear and convincing evidence that the respondent has violated rule 5.5 of the Rules of Professional Conduct by engaging in the unauthorized practice of law as defined in Practice Book § 2-44A.

---

[11] On February 15, 2018, the Appellate Court issued an order clarifying its order of December 9, 2014 by stating that the original order precluded "attorney Smalls Miller from providing legal services of any kind in connection with any Connecticut Appellate Court matter until she files a motion for reinstatement and that motion has been granted." At the presentment hearing, the respondent acknowledged that this order did clarify the original order. However, the latter order is not necessary for a finding of a violation of Rule 5.5, or any other rule, as the facts are sufficient to establish a violation of the rules based on the language of the original order alone. [Petitioner's Ex. 2].

IV

*Respondent's Affirmative Defenses*

The respondent has raised two amended affirmative defenses to the allegations of the amended presentment complaint. Specifically, the respondent contends that the recommendations of the petitioner and/or the decisions of the SGC were based upon both racially discriminatory and retaliatory reasons in violation of the respondent's constitutional rights under the fourteenth amendment to the United States constitution and article first, § 20 of the Connecticut constitution.

Special defenses are appropriate in a disciplinary hearing. See *Statewide Grievance Committee* v. *Presnick*, 216 Conn. 135, 139, 577 A.2d 1058 (1990) ("[d]espite its sui generis character, we see no reason why a presentment should proceed in a piecemeal fashion and why basic concepts of res judicata are not equally applicable to presentment proceedings"). The respondent's attempt to raise these special defenses, however, is unavailing. While this is not a regular civil proceeding, a review of Practice Book § 10-50 would be instructive in this regard. The purpose of a special defense is to set forth facts that "show that the [petitioner's] statements are untrue." It can also be used to set forth facts that are consistent with such statements, but show nonetheless that the petitioner has no cause of action.[12] The respondent's special defenses fail to do either. They simply recite legal conclusions of racial discrimination or retaliation unsupported by any factual allegations, and such conclusory allegations are insufficient to properly plead a special defense. See *Vendor Resource Management* v. *Estate of Zackowski*,

---

[12] Practice Book § 10-50 states: "No facts may be proved under either a general or special denial except such as show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged. Thus, accord and satisfaction, arbitration and award, duress, fraud, illegality not apparent on the face of the pleadings, infancy, that the defendant was non compos mentis, payment (even though non-payment is alleged by the plaintiff), release, the statute of limitations and res judicata must be specially pleaded, while advantage may be taken, under a simple denial, of such matters as the statute of frauds, or title in a third person to what the plaintiff sues upon or alleges to be the plaintiff's own.

Superior Court, judicial district of Middlesex, Docket No. CV-17-6016941-S (August 10, 2017, *Vitale, J.*). It has long been held that special defenses must allege facts which the proponent then has the burden to prove. See *Kaye* v. *Housman*, 184 Conn. App. 808, 817, __ A.3d __ (2018).

Moreover, the allegations of her affirmative defenses do not actually constitute a special defense, instead, they constitute an independent cause of action through which the respondent can seek specific damages or other relief. See, e.g., *Sovereign Bank* v. *Harrison*, 184 Conn. App. 436, 444, __ A.3d __ (2018); *Mitchell* v. *Guardian Systems, Inc.*, 72 Conn. App. 158, 167 and n.6, 804 A.2d 1004, cert. denied, 262 Conn. 903, 810 A.2d 269 (2002). "Although a counterclaim is similar to a special defense in that both are employed by a defendant to diminish or defeat a plaintiff's claim, they nonetheless are separate and distinct types of pleadings. . . . The heart of the distinction is that a counterclaim is an independent cause of action, and a special defense is not. See *Historic District Commission* v. *Sciame*, 152 Conn. App. 161, 176, 99 A.3d 207 ("[a] counterclaim is a cause of action . . . on which the defendant might have secured affirmative relief had he sued the plaintiff in a separate action" [internal quotation marks omitted]), cert. denied, 314 Conn. 933, 102 A.3d 84 (2014); *Valentine* v. *LaBow*, [95 Conn. App. 436, 447 n.10, 897 A.2d 624, cert. denied, 280 Conn. 933, 909 A.2d 963 (2006)] ("a special defense is not an independent action"). . . . [A] special defense operates as a shield, to defeat a cause of action, not as a sword, to seek a judicial remedy for a wrong." (Citations omitted; internal quotation marks omitted.) *Sovereign Bank* v. *Harrison*, supra, 444.

In fact, at the presentment hearing, the respondent presented evidence through her witness Rebecca Johnson that she has in fact done so. In *Rebecca L. Johnson, et al.* v. *Karyl Carrasquilla, et al.*, United States District Court, Docket No. 3:17-CV-01429 (MPS) (D. Conn.), the respondent is a co-plaintiff who has brought an action against Karyl Carrasquilla as Chief

Disciplinary Counsel and Michael Bowler as Bar Counsel for the SGC, alleging that "Johnson and Miller have been targeted by the attorney discipline authorities in a racially discriminatory manner, and in part because of their civil rights litigation practice." [See Respondent's Ex. N, ¶ 27]. In the complaint, the respondent makes the same arguments and allegations that she presented in her testimony and pleadings to this court as part of the presentment hearing. That federal complaint goes into considerable detail relative to her claim of disparate treatment by the disciplinary authorities relative to herself, Rebecca Johnson and other African-American attorneys as compared to the treatment given to Caucasian attorneys engaging in what they describe as similar conduct. From a review of that complaint, it is clear that even if the respondent's special defenses are not viable in the presentment hearing, she will not be prejudiced if precluded from pursuing them as she has already exercised her right to relief from and for such treatment in a prior pending claim in federal court. Indeed, the fact that the respondent has brought an action based on these allegations only reinforces the court's conclusion that her "affirmative defenses" are not proper special defenses.

In the matter now before this court, the respondent has, through her own testimony and that of Rebecca Johnson, set forth a lengthy recitation of the conduct that they engaged in which led to disciplinary action against them compared to the similar conduct of Caucasian attorneys who received no discipline. The respondent particularly referenced her own attempts to have the disciplinary counsel or the SGC investigate complaints against Caucasian attorneys only to have the disciplinary authorities refuse to do so. [Tr. 3 103:1-23, 124:27-125:22, 127:1-135:4; Tr. 4 7:5-11:13, Miller]. However, the respondent's own testimony made clear that upon the respondent's informal presentation of a September 1, 2015 letter and materials containing information relative to the possible misconduct of other attorneys, the disciplinary authorities

responded with a September 4, 2015 letter detailing the proper process for lodging such a complaint and advising the respondent that she was free to resubmit it. [Respondent's Ex. S]. That letter read in relevant part as follows:

> In your letter, you "ask that these matters be investigated as soon as possible." If you have evidence of attorney misconduct, you are welcome to file grievance complaints, as you already have done regarding two of the attorneys mentioned in your documents. Any additional grievance complaints which you file will be processed in accordance with Practice Book § 2-32 (a).
>
> Alternatively, you can submit to our office information you have regarding any alleged attorney misconduct, along with supporting documentation. Our office will then determine whether the information and documentation is sufficient to support a referral of the misconduct to a grievance panel. If so, the Grievance Panel to which any such referral is made will then investigate the allegations and make a determination as to whether a grievance complaint should be filed. Please note, however, that any such submissions by you should address the alleged misconduct of any such attorney in a separate and individual filing, to allow the consideration of each matter to be conducted without reference to irrelevant and immaterial allegations regarding other attorneys.

[Respondent's Ex. S].

This is clearly contrary to her claim at the hearing, and as addressed in her post-hearing brief, that disciplinary authorities refused to investigate. Moreover, there is no evidence that she ever resubmitted the materials consistent with the provisions of Practice Book § 2-32 (a).

Again, the defenses raised by the respondent are not properly before the court in this proceeding and, further, would fail even if they were properly before the court because she has failed to meet her burden of proof in this regard.[13]

---

[13] The respondent spent a considerable portion of her time at the hearing addressing the claim of disparate treatment. She presented her own testimony, that of Rebecca Johnson, and cross-examined witnesses attorney Michael Bayone and attorney Betsy Ingraham on the issue. However, her focus on this issue did nothing to address or rebut the allegations contained in the four counts of the presentment. For example, she claims in part that cases were dismissed because she used a caseflow request form to ask for a continuance of a trial date instead of a motion for continuance form. This, however, ignores the ample evidence that there were multiple other reasons that collectively led to the dismissals and it was not based solely on her use of a caseflow request form. She also claimed that when she confronted a judge claiming that ex-parte communications were held between that judge and opposing counsel, the judge failed to respond and such silence constituted an admission on the judge's part. This of course is of no moment as the judge was not a party or witness in the proceeding and therefore was not subject to questioning

V

*Discipline*

Pursuant to Practice Book § 2-47 (a), if the court finds following a presentment hearing that an attorney has violated the Rules of Professional Conduct, it may impose a "reprimand, suspension for a period of time, disbarment or such other discipline as the court deems appropriate." The trial court possesses a great deal of discretion in this regard. *Statewide Grievance Committee* v. *Timbers*, 70 Conn. App. 1, 3, 796 A.2d 565, cert. denied, 261 Conn. 908, 804 A.2d 214 (2002), cert. denied, 537 U.S. 1192, 123 S. Ct. 1274, 154 L. Ed. 2d 1027 (2003). As was noted above, in determining whether any discipline should be imposed, discipline or sanctions are not intended to punish an attorney but rather to safeguard the courts and the public from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession. Additional facts will be set forth below as necessary to address the issue of what discipline is to be imposed.

Reviews of misconduct are often guided by the use of the American Bar Association's Standards for Imposing Lawyer Sanctions which has been approved by the Connecticut Supreme Court. *Burton* v. *Mottolese*, supra, 267 Conn. 55 and n.50. The Standards provide that, after a finding of misconduct, a court should consider: "(1) the nature of the duty violated; (2) the attorney's mental state; (3) the potential or actual injury stemming from the attorney's misconduct; and (4) the existence of aggravating or mitigating factors." A.B.A., Standards for Imposing Lawyer Sanctions (1986) Standard 3.0; see also *Burton* v. *Mottolese*, supra, 55. The Standards list the following as aggravating factors: "(a) prior disciplinary offenses; (b) dishonest

---

or any obligation to answer a question posed. The respondent has gone so far as to uniquely characterize her view of the motive behind her treatment by disciplinary authorities. On page 15 of her post-hearing brief, the respondent states "[s]omeone with a desire to remove a pesky Negress from practicing in the Connecticut courts surely had a hand in this matter."

or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution and (k) illegal conduct, including that involving the use of controlled substances." A.B.A., Standards for Imposing Lawyer Sanctions (1986) Standard 9.22; see also *Burton* v. *Mottolese*, supra, 55.

The Standards also list the following as mitigating factors which are to be considered: "(a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse when: (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused the misconduct; (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely; (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions;  (l) remorse; [and] (m) remoteness of prior offenses." A.B.A., Standards for Imposing Lawyer Sanctions (1986) Standard 9.32; see also *Burton* v. *Mottolese*, supra, 55-56.

With these standards in mind, the court must first consider the nature of the duties violated by the respondent. As to count one, the respondent's maintenance of an IOLTA account placed upon her a duty to hold her clients' funds with the care required of a professional fiduciary. Rules of Professional Conduct 1.15, commentary. By depositing the respondent's personal funds into the IOLTA account, she violated a duty owed to her clients and to the legal profession to keep client funds separate from her own. The reason given for the deposit of the gift from Ms. I Am into the IOLTA account—that she was acting peculiarly—was not reasonable under the circumstances. Nor was the respondent's delay in responding to the petitioner's request for documentation explained by any sort of mental impairment or other valid reason. A breach of this duty to comply with the rules of the profession and to comply with requests from disciplinary authorities reflects adversely on the profession as a whole and not just on the one attorney. The duties to her clients in counts two, three and four all stem from her obligation, individually and as an officer of the court, to abide by the rules and orders of the court and to not to engage any in misconduct. By acting in disregard of court orders and failing to diligently attend to her cases, the respondent has engaged in conduct that was prejudicial to the administration of justice. Further, she failed to meet her duty to communicate with her client about the matter for which she was retained.

With respect to her mental state as to all counts, the court does not find any impairment that would have prevented the respondent from acting appropriately or consistently with her obligations under both the Rules of Professional Conduct and the rules of practice, including orders issued by the court.

While no financial harm came to her clients as result of the deposit of the respondent's personal funds into the IOLTA account as described in count one, there were potentially serious

financial consequences to those of her clients whose actions and/or claims were dismissed by different courts without a hearing on the merits as a result of her failure to comply with the Rules of Professional Conduct or court orders as described in count two. Both of her clients in the *Stone* matter (employment discrimination claim) and the *Meszaros* matter (motor vehicle personal injury claim) had their actions/claims dismissed. Neither dismissal was appealed to the Appellate Court. With respect to counts three and four, the respondent's actions in representing Williams relative to the appeal of the judgment terminating her parental rights resulted in a financial loss to Williams through her payment of a retainer and any other fees to the respondent that she was not rightfully entitled to earn due to the suspension she was actively under. The respondent's actions were done intentionally and in direct contravention of a valid court order.

In reviewing the alleged misconduct under the ABA Standards, the court can also consider any aggravating and mitigating factors that are relevant to the respondent's actions. There are several relevant aggravating factors. First, the court looks to see if there is any history of prior disciplinary actions. The respondent received a reprimand in 2015 based on a violation of Rule 11 of the Federal Rules of Civil Procedure in *Miller* v. *Bridgeport Board of Education*, United States District Court, Docket No. 3:12-CV-01287 (JAM) (D. Conn. July 30, 2014). There the court found that as to the complaint filed by the respondent, no objectively reasonable attorney could have made the allegations, in the complaint, without knowing that they were verifiably false. [Id.; see also Tr. 1 92;12-14, Ingraham]. There is, of course, also the ongoing suspension by our Appellate Court.

A pattern of misconduct may also be considered as an aggravating factor. Evidence was presented at the hearing that the respondent has been involved in eleven cases where her client's action or claim has been dismissed directly as a result of the respondent's conduct. Some

include the dismissal of the *Stone* and the *Meszaros* matters set forth above. Also, in *Miller* v. *Appellate Court*, 370 Conn. 759, 770 (2016), our Supreme Court identified the dismissal by the Appellate Court of the following cases:  *Addo* v. *Rattray*, Docket No. AC 38637 (respondent failed to timely file the appellant's brief and appendix in compliance with the appellate rules); *Willis* v. *Community Health Services*, Docket No. AC 36955 (respondent failed to respond to a July 31, 2014 order *nisi* informing her that the appeal would be dismissed if, by August 11, 2014, she did not file a certificate indicating the estimated date of delivery of the transcript pursuant to Practice Book § 63-8 (b); also failed to appear at a previously scheduled hearing and falsely certified that certain documents had been sent to opposing counsel); *Cimmino* v. *Marcoccia*, Docket No. AC 35944 (respondent failed to meet deadlines and to comply with the rules of appellate procedure and court orders.); *Coble* v. *Board of Education*, Docket No. AC 36677 (dismissed as frivolous). [Respondent's Ex. T].  At the trial level, *Coble* had been nonsuited for failing to prosecute the action. [Respondent's Ex, B]. This court takes judicial notice that following the non-suit, the action was refiled under the accidental failure of suit statute. The trial court subsequently entered a summary judgment against the plaintiff and the court supplemented its decision with a special finding pursuant to General Statutes § 52-226a that the refiled action was meritless and not brought in good faith. [See Judge Gilardi's order #127.20 in the matter of *Coble* v. *Bridgeport Board of Education*, judicial district of Fairfield, Docket No. FBT-CV-13-6033790-S]. Additionally, during the course of this presentment, the respondent herself referenced *Igidi* v. *Department of Correction*, (dismissed for failure to timely respond to discovery). [Tr. 4 109:6-15, Miller].   Even in *Miller* v. *Bridgeport Board of Education*, judicial district of Fairfield, Docket No. FBT-CV-10-6011406-S, where the respondent prosecuted her own action for the collection of attorney's fees, the matter was dismissed for her failure to appear

at trial on July 10, 2012. [Respondent's Ex. D]. In *Smith* v. *Connecticut Department of Correction, et al.*, United States District Court, Docket No. 3:13-CV-00828 (VLB) (D. Conn.), the respondent sought attorney's fees for her representation of the plaintiff but the matter was dismissed. [Tr. 4 107:6-8, Miller]. In that case that court stated:

> "On August 4, 2014, the defense filed a partial motion for summary judgment, and the Court entered an order dismissing the specious claim for monetary damages from a defendant sued in their official capacity.
>
> Such a claim is well-known to be barred by the Eleventh Amendment, and the court has, I believe, issued decisions on cases filed by attorney Miller previously noting that well-settled law.
>
> Why the plaintiff persists in filing such specious claims to which the defense has to respond and the Court has to waste its time reiterating well-settled law that such a claim is barred is beyond the Court's comprehension."

[Petitioner's Ex. 3, referencing exhibit E; transcript pages 4-5].

As to the aggravating factor of multiple offenses, there have been findings of probable cause by the appropriate grievance panels as to each count which have led to the respondent's presentment. Each count alleges different violations of the Rules of Professional Conduct and the court has found clear and convincing evidence as to the violation of nine different rules.

Another relevant aggravating factor is the refusal to acknowledge the wrongful nature of one's conduct. The respondent, throughout the presentment process, has not acknowledged any wrongful conduct and has taken no steps to address the issues that led to her suspension by the Appellate Court despite being given a clear roadmap by that court on how to do so.  To this factor, the court must recite additional facts.  From her testimony it is clear that the respondent sees herself as a victim of conspiracies by both individual judges as well as a bureaucratic one through the Office of the Chief Disciplinary Counsel and SGC. Generally speaking, she contends that because she is African-American she is treated differently, in a negative way, than Caucasian attorneys by both judges and the disciplinary offices. Effectively, her contention is

that Caucasian attorneys who engage in conduct similar to hers are not referred for discipline or admonished by the courts whereas she has been.

At the presentment hearing, the respondent testified that at a court hearing before Judge Bellis she saw at least four judges standing there [in or around the courtroom] "obviously waiting to see what was happening" and then immediately going in to talk to Judge Bellis "about what had occurred." [Tr. 4 110:3-12, Miller].   When questioned by this court as to whether a remedy "would be to bring a complaint against Judge Bellis before the Judicial Review Council" the respondent replied "I think we all know that hardly anybody who was ever brought before that Counsel [sic] gets any kind of relief. Or, rather, I should say, any - judges who are brought before that Counsel [sic] nothin[g] ever happens." [Tr. 3 94:7-10, Miller].   In another matter, the respondent testified that she argued an objection to a motion to dismiss her claim.   During the argument, Judge Bellis asked opposing counsel why she had waited almost a year to file the motion to dismiss. The respondent confronted Judge Bellis about the reason for her question and testified that the judge did not respond.   As a result, the respondent sought and obtained a transcript of the proceeding, but testified that "all reference to this matter had been removed from the hearing transcript." [Tr. 3 121:4-8, Miller].   Her testimony unabashedly implied that the judge had pressured a court monitor or conspired with the monitor to manipulate an official court recording. The court does not find her testimony as to these matters credible and she submitted no other evidence corroborating this allegation. See Rules of Professional Conduct 8.2 (a).[14]

The respondent also referenced an incident in the *Cimmino* matter in which her client had received a favorable jury verdict. She alleged that after confronting Judge Bellis about having

---

[14] Rule 8.2 (a) of the Rules of Professional Conduct provides: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office." Such comments are sufficient on their own to establish a basis for discipline of an attorney. See *Statewide Grievance Committee v. Burton*, 299 Conn. 405, 413, 10 A.3d 507 (2011).

communications with opposing counsel in a different matter, the trial judge in *Cimmino* appeared to have a discussion with Judge Bellis about *Cimmino* and that the jury verdict was set aside shortly thereafter. [Respondent's Ex. G]. In support of this claim, the respondent testified "[i]n my mind, it appeared to me that the change was because of a conversation I had with Judge Bellis." [Tr. 4 112:12-13, Miller]. In her post-hearing brief, the respondent referred to it as "an unexplainable reversal" and that "[t]here is a reasonable inference that this request came at the request of the presiding judge." [Respondent's post-hearing brief, p. 12]. The clear implication is that Judge Bellis persuaded or pressured a trial judge to reverse a jury's decision and to have the verdict set aside. No other evidence was presented in support of this claim. The court gives little weight to this testimony as it is simply rank speculation and opinion on her part.

Lastly, the court may consider the respondent's experience in the practice of law. The respondent has been an attorney since 1980 and has been a solo practitioner in Connecticut since 2002. [Respondent's Ex. K].[15] She has practiced in both federal and state court and worked for executive agencies at the state and federal level. She has worked as counsel for private corporations. She is not a newcomer to the practice of law and in fact has substantial litigation and appellate experience. In this respect, the respondent presented evidence in the form of her resume, Respondent's Exhibit K; and a court ruling in the matter of *Gaul* v. *New Haven*, United States District Court, Docket No. 3:14-CV-00558 (D. Conn. March 12, 2016), relative to her motion for attorney's fees in which Judge Meyer found her to be "a highly capable and skilled trial attorney, and that those skills were indispensable to the success of her client in this case." [Respondent's Ex. L]. However, he also noted in that same ruling that the court had "been previously critical of the conduct of [the respondent] in a different case, see *Miller* v. *Bridgeport Board of Education. . . .*" [Id]. From such experience one would normally expect a practitioner

---

[15] See footnote 3 above.

to have acquired a well-versed knowledge of the Rules of Professional Conduct, and as a practical matter, a basic understanding of courtroom process, demeanor and the professional expectations that go with it.

The only relevant mitigating factor the court can mine from the testimony presented at the hearing is the physical illness the respondent described she experienced around September, 2014 which she claims prevented her from attending court proceedings before Judge Bellis and in the federal court. Even that testimony and evidence was called into question by virtue of the respondent's conduct in filing other pleadings in other cases that same day after advising the court that she was too ill to appear in court. It was also exposed as misleading and inaccurate through her questioning by Judge Bryant. Though there was some credible evidence presented to demonstrate that she may have had undiagnosed medical issues at the time of the events that led to the presentment with respect to the *Meszaros* matter; Respondent's Exhibit M; it does not appear that she was unable to represent her client at that time due to a medical condition, nor did it affect her performance with respect to the other matters for which she has been presented. Even if ill, it was the respondent's obligation to ensure that her clients' interests were adequately protected. Her failure to take those steps to protect her clients resulted in adverse outcomes for them.

The court finds that the aggravating factors clearly outweigh any potential mitigation. "A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials." Rules of Professional Conduct, Preamble. The respondent's actions have resulted in injury to the legal profession through her disrespect for judicial authority and her unwillingness to abide by specific court orders. Also, despite having had the opportunity since near the end of 2015 to lift the Appellate Court suspension, there was

no evidence presented that she has attempted to take any of the steps outlined by that court to do so;

## VI

## CONCLUSION

As to count one, the respondent is guilty of misconduct in that she violated rules 1.15 (a) (5), 1.15 (c), and 8.1 (2) of the Rules of Professional Conduct. The respondent is suspended from the practice of law in Connecticut effective immediately for a period of thirty (30) days. The general conditions stated herein shall apply as to this count.

As to count two, the respondent is guilty of misconduct in that she violated rules 1.3, 3.2, and 8.4(4) of the Rules of Professional Conduct. The Respondent is suspended from the practice of law in Connecticut effective immediately for a period of six (6) months. This suspension shall be concurrent to the suspension in count one. The general conditions stated herein shall apply to this count.

As to count three, the petitioner has failed to carry its burden of proof as to a violation of rules, 1.4 (a) (1), (2), (3) and (4) of the Rules of Professional Conduct and those charges are dismissed. However, the respondent is guilty of misconduct in that she violated rules 1.4 (a) (5) and 1.4 (b) of the Rules of Professional Conduct. The respondent is suspended from the practice of law in Connecticut effective immediately for a period of one (1) year. The suspension shall be concurrent to the suspensions of count one and two. The general conditions stated herein shall apply to this count.

As to count four, the respondent is guilty of misconduct in that she violated rule 5.5 of the Rules of Professional Conduct. The respondent is suspended from the practice of law in

Connecticut effective immediately for a period of one (1) year. This suspension shall be concurrent to the suspensions in counts one, two and three.

In addition to the above, these general conditions shall apply:

The petitioner is ordered to designate a Trustee, subject to the approval of the court, to take such steps as are necessary pursuant to Practice Book § 2-64 to protect the interests of respondent's clients, to inventory respondent's files, and to take control of her clients' funds, and any IOLTA or other fiduciary accounts. A hearing shall be held by the court relative to the approval of the designated Trustee on January 3, 2019 or sooner upon motion of the petitioner. Once approved, the respondent must fully cooperate with the Trustee in all respects. Failure to do so may constitute additional misconduct and subject her to additional sanctions by this court.

The respondent shall comply with all terms and conditions of Practice Book § 2-47B; Restrictions on the Activities of Deactivated Attorneys.

The respondent shall comply with all terms and conditions of Practice Book § 2-53 in the event that she applies for reinstatement to the Connecticut bar following her period of suspension.

Prior to reinstatement in Connecticut, the respondent must satisfy any Connecticut bar requirements and must be otherwise in good standing.

As a condition of reinstatement to the bar, the respondent must agree that upon reinstatement she will be mentored for a period of one year by a practicing attorney with at least ten years of experience in the Connecticut bar. Such mentor shall be a member of the Connecticut Bar Association, be in good standing, have no disciplinary history and shall acknowledge in writing their willingness to so act. The mentor's appointment shall be effective only upon the approval of this court and shall be made by separate motion by the respondent.

The respondent shall, as a condition of reinstatement, attend a Connecticut Bar Association approved continuing legal education course in both legal ethics and law office management. Such courses must be attended in-person and not on-line. Written proof of the attendance shall be required as a condition of reinstatement.

Any relief from suspension relative to her practice before the Appellate Court must be made separately to the Appellate Court consistent with its orders of December 9, 2014 and February 15, 2018.[16]

BY THE COURT

Shaban, J.

---

[16] Though not all exhibits admitted into evidence have been specifically referenced in this decision, the court has reviewed all of the exhibits and considered and reviewed the testimony of each witness.